Jonathan Levy for the appellant to Holocaust survivors in this case. This was originally in action by Holocaust survivors against the Vatican Bank and other defendants for World War II era restitution. This court had this case in the past. This court had this case back in 2005 and as a result of that ruling this became an action for post-war money laundering by the Vatican Bank and co-defendant. A Franciscan order which is not before this court. The material laundered was mainly gold from concentration camps in former Yugoslavia and some other assets. The issues that we have before this court are, number one, is the Vatican Bank actually an organ or instrumentality of the Holy See, which is sometimes referred to as the Vatican City State? Same thing for the point of view of this. And did the end of the question, let's assume that it is an organ or an agency and move on from there. Then your case gets difficult because are there any assets in the United States? Have there ever been any assets in the United States? Are any that can be identified? Well, there's two answers to that, Judge Fletcher. One is that gold is a fungible asset. Therefore, gold was smelted down as we put in our brief, combined, commingled as a result of the defendants action or at least the co-defendant Franciscan order. And once that happens, it's really hard to tell if that gold was physically in the U.S. or was credited in the U.S. because we allege the Vatican Bank was engaged in a gold trading program with the Federal Reserve Bank and the Republic Bank of New York. Secondly, it's my understanding that under the international taking exceptions to the Foreign Sovereign Immunity Act, we don't actually have to have the property in the U.S. That is, the property was taken, expropriated in violation of international law. I'm going to the second prong of that. Then the defendant does commercial transactions in the U.S. And in support of that, we quote the Lubavitch or Hasidic case versus Russia from the D.C. circuit where the Lubavitch movement sued Russia to get back their library that was expropriated in 1917. That case came up in the U.S. It came up very recently, just within the last year or two, to the D.C. circuit. And because at some point the Russian National Library had published books that were sold in the U.S., not those books, but published some other books, that meets the commercial transaction prong of the expropriation section. Let me ask you a question. I read your pleadings. What part of your pleadings are in the U.S. and what part of your pleadings are in the U.S. I'm not looking for any more than conclusory or just suggesting that there is an international taking. Where do I find any facts in your pleadings about international takings? Facts. Not just, oh, there was a taking, this is the way it is. My worry is that the pleadings are not specific at all about the takings that happened. Well, Judge Smith, first of all, this is a facial challenge to the pleadings. And I'm not sure that we even go into whether they're speculative or not. It's whether they're impossible or frivolous. But because this is a facial challenge, the same as in Doe v. Holy See, do we really get into arguing the facts? But to answer your question. Well, but I have to see something pled more than, well, we've just had an international taking here. I've got to have something that shows me some facts that show what was taken and by whom and for what. Even if it's a facial challenge. I can't just generally suggest there's a conclusory taking and come to court. So where do I go to the complaint to find more than these conclusory ideas? In the Fourth Amendment complaint, we discussed that entire process. The Ustasha movement, which was the government of Croatia at that time, not recognized by the United States, ran concentration camps. Is that, those general allegations about that, is that what you think is sufficient to meet more than a conclusory allegation? Well, I think. I'm trying to lay, I mean, I really read your brief pretty carefully in order to try to find, if you will, an international taking. And I'm trying to find some facts upon which I can really suggest that. All right. Let's assume for a second that we don't have a problem with the Ustasha movement going and killing people at concentration camps, having a program that we document in there about then consolidating this loot and then transporting it to Italy after the Second World War. A ten-truck convoy comes down and deposits that loot at the Vatican Bank. And we, I believe in the Fourth Amendment complaint, avert to the fact there's a witness to that who investigated that, Mr. Gowin. And that's in the, of course, the docket. He was deposed for four days. He was the special investigator for the U.S. Army at that time in 1946 and 1947. He interviewed the principals involved in the money laundering, Father Draganovich, Father Mandich, and Colonel Babich, who headed up that convoy. So you do have an international take. You have gold that was stolen in violation of the London Gold Agreement, because I think everybody agrees that looting property during genocide is a violation of international law. And I guess the question here is, if you're dealing in the profits of that genocide and asking and acting as an accomplice after the fact, and you're an actual punitive organ of a state that the Vatican Bank is claiming it is, are you engaging in a violation of international law? And that would appear to me, dealing in sacks of gold teeth and people's wedding rings and smelting them down and trading them internationally to support a fascist movement after the Second World War, that's a violation of international law. Well, moving beyond the takings, we have to have commercial transactions in the United States that have some nexus to these takings. I disagree with that, Judge Fletcher, because I think if you read the second prong of that exception, if you have the property taken in violation of international law and the defendant engages in any commercial act in the United States, that meets the foreign – that particular exception to the Foreign Sovereign Immunity Act. I don't think you have to have an actual nexus between that property and the commercial act. If, in fact, you're wrong about that, are your pleadings sufficient? I think on a facial challenge, the pleadings are sufficient because they're non-frivolous and they're not impossible. And I think this Court in Doe v. Holy See made the same sort of finding, that on a facial attack, and this is from 2009, the Court cannot require a greater-than-usual level of detail in the pleadings and may not construe – well, that it – the district court has to construe the factual allegations in the favor of the plaintiffs. And it can't require a greater showing than normal. So if this is really a facial attack and you're back to facial attack, then what do I make of your arguments about the Rule 41 – 44-1 affidavits? It seems to me that what you're suggesting with Rule 44-1 affidavits is you're suggesting that they are not sufficient. It's a sufficiency allegation. So if it's really a facial attack, isn't that in your argument about sufficiency? Well, I mean, if you – each one of these questions, you come back and say facial. This is a facial attack. But your whole argument to the – if your whole argument to the 44-1 affidavits is sufficiency, it seems to me that it runs totally contrary to your facial argument that you're now making. Because if, in fact, the 44-1 affidavits are okay to let in, which I thought would be your argument rather than sufficiency of the evidence on a facial attack, but if, in fact, 44-1 affidavits are okay to let in in order to just suggest what the law is of the foreign country, then it seems to me that your argument that they are not sufficient on a facial attack goes to pot. We made both those challenges. First of all, we did object to the form of the 44-1 affidavit, which, of course, I'm not even sure is evidence. Where did you make anything more than a sufficiency argument to the district court? We made a motion. It's in the docket. But I did read that motion, and I didn't see it. It's limited to sufficiency of the showing, as I understand. I never saw anything in there that says, well, that isn't the law, and if I had a chance to discover it, I'd show you a different law. That wasn't the effort of the motion. The motion was that what you've got here is not sufficient to say what it needs to say. Well, we argued it was not in the proper format because how can you review it de novo if you don't know what it is, when it's a bunch of Italian and Latin treatises, which may or may not be black-letter law? We would suggest that pastor bonus, which is the law of the Vatican State and which is cited there in 1988, does not refer to the Vatican Bank or Institute for Religious Works by name. It talks about a special institute, doesn't name what it is, names two other Vatican financial institutions, and that's pastor bonus. And it's published in 1988, yet Caridi says, and it speaks in the present tense, and Caridi says Vatican Bank was founded in 1990. The other black-letter law is the Kirograph of the Vatican Bank, which is a bylaw. And all that says is that it's a public juridic entity, and U.S. courts have consistently disregarded public juridic entities under canon law, because a public juridic entity can be a parish, it can be, according to Caridi, the co-defendant Franciscan order is a public juridic entity. That doesn't mean anything. So it's sufficiency and format. And the fact that the district court utilized it for a factual analysis, which it's almost as if that 44.1 declaration, which purports to state law, is being used for the factual analysis in EIE Guam, when in fact the court should be looking at the complaint and not what's in the Caridi declaration, because it's a facial attack. But you certainly agree that we can look at foreign law in order to determine those particular situations. That's in the case law. And as I understood it, the way you attack the 44.1 declaration is not because it's factually wrong, but it is insufficient as to tell you the true law of what it ought to be. Well, that waives that it's wrong, and I want to go out and discover. And so, therefore, we should not be allowing this. And that's why I've asked you the questions about if it's really a facial attack, don't we have to rely on the 44.1 and determine whether that can really get to the point that the Holy See is involved? Correct. And we're saying how can you do that if there's no law or translation attached to that document? When the normal standard in every other court is to, if it's a Latin document, you want to see the document and you want to see the translation. You have about two minutes left. Do you want to reserve for rebuttal? That's fine. Thank you. Good morning, Your Honors. Jeffrey Lina for the Institute for Religious Works. Perhaps I'll start by where opposing counsel left off, which is the question of organ status. We submitted a declaration from an expert that details and meets to that detail all of the EIE Guam factors, factors that plaintiffs could have argued below and did not argue, in fact, waived. In addition to that, Your Honor, my 44.1 declaration provided the district court with all of the essential documents in translation necessary to determine whether or not the Caridi Declaration was adhering to the documents cited. I also provided a set of additional documents which plaintiffs could have gone back to the court and requested additional translations of if they had wished. They did not do that. They chose to go forward, ignore the EIE Guam factors, and simply argue on a disavowal theory below that if they could prove that the IOR was involved in nefarious behavior, then the Holy See would disavow its existence as an organ. So below, plaintiffs were far afield in terms of arguing the factors. On appeal, we believe that we've shown in detail that we met the factors. It's only a prima facie case that's required. If that case is not, if a higher standard is met, then it effectively puts the foreign sovereign in a difficult position of having to litigate an issue deeply before raising its sovereign immunity so it's drawn into the jurisdiction of the court. That's, I think, the purpose of the prima facie showing is, and that prima facie showing has been acknowledged to be quite low in the cases that we cite. And in fact, one case we did not cite, Siderman, there's an instrumentality issue and not much is required. So we feel we've met, more than met, the requirements for organ status. So why shouldn't the magistrate judge have allowed discovery on jurisdiction? Well, there's a line of demarcation in these cases when immunity is at stake, and discovery Correct, but I mean, that's a threshold issue, and I don't understand why limited discovery shouldn't have been awarded at that time to explore it. You can say here that they didn't do this, they didn't do that, but when they're denied discovery, it certainly limits their ability. I think the question is whether or not we, the foreign sovereign, met its prima facie case and whether there was anything suggested by the other side that could rebut that case. They have tried three times to obtain jurisdictional discovery, and each time the court evaluated that and determined that they hadn't provided any sort of information that would suggest that it was necessary to engage in such discovery. For example, a counter declaration or some evidence of foreign law that would suggest that our declarant, who's an expert acknowledged by plaintiffs, is wrong. Counsel, opposing counsel says if they show that there has been an international wrongful taking, then they show commercial activity which is completely unconnected to the wrongful taking, that that's all that they have to show. Is that right? Well, in this case, no, that's not correct. What plaintiffs would have to show under the second prong, first of all, plaintiffs, I believe, are referring to the owned or operated prong under the under A3, under which there may be assets which are rights and property taken in violation of international law, which are owned or operated by the foreign sovereign. Here we have a situation where plaintiffs have not pled in their complaint, facts that would even suggest that any of that property is presently owned or operated by the IOR. But in addition, the as the district court noted, the facts that plaintiffs do attempt to plead, for example, the gold transactions are far too attenuated and unrelated to the transaction at issue. So the answer is no. Well, what is the transaction at issue? Can you define that transaction for me? Well, perhaps transaction is not the correct word because effectively, as plaintiffs have indicated, what their theory of the case is, is that there was some sort of taking in Croatia. And following that taking in Croatia, a variety of things happened to this property.  I think that's what plaintiff's complaint and plaintiff's argument suggests. We don't know whether it went into a treasury, although they claim there's a generalized policy allegation that should be barred under Iqbal and under this court's decision in Moss in the Ninth Circuit. But in addition to that, there are allegations in the complaint that are specifically contra that any of plaintiff's property, not just a portion of the treasury, as the district court pointed out, but any of plaintiff's property could have ever arrived at the IOR. That's the problem with this complaint. The complaint makes clear that some of this property was destroyed, some of this property was used for other purposes, some of this property was used by the Croatians to fight the war, and then at the end of this trail of possible uses of the property, there's a theorization that perhaps some of it came down the Italian Peninsula, arrived in Rome, and eventually ended up in the IOR. That is the problem. Right. But presuming let's accept that as true for the sake of the question, and that is if they've sufficiently alleged that, do they have to show a nexus between that and activity in the United States in terms of commercial activity? Certainly there's a powerful nexus. Their argument is no. You just have to show commercial activity and a facts that constitute an international taking within the meaning of the exception. That would be incorrect. There's a powerful nexus requirement under both prongs, and they don't meet either. In particular, under the second prong. What case law do you have that supports that? Which supports the nexus requirement. The nexus part. The nexus requirement is, I think, supported by, in particular, the Freund case. The Freund case was a French case in which a French depository was sued, together with the French train system, on the theory that the property that was originally taken by the train system and then deposited in a French depository had some connection to the United States or that that property was owned or operated by the French depository and there was some connection to the United States. The court in that case rejected that theory, in particular because so much time had passed. This is, of course, a problem here that the requirement is that the property presently be owned or operated, not even that it was ever at one time held, but it presently be owned or operated. And as to this, this is entirely speculation. Now, in the Siderman case in which I was involved, the Argentine government had seized hotels and other property that belonged to the Sidermans. And then they advertised in the United States for customers for the hotels. Yes. And that seemed to be a nice, clean case of nexus. Yes. As I understand it, ultimately, this Argentina, rather than actually go to trial, paid many millions of dollars to the Siderman family. But that's a clear case. But what other cases would show an adequate nexus? I think Siderman is actually an excellent example of a clear counter case, because you have property that's identifiable, you have a citizen in the United States that there's a taking in violation of international law, and you have clear credit cards and other financial transactions that suggest that there is a nexus with the United States. And you also have, even under the second prong of A3, there is a clear indication, because in Siderman there was a detailed complaint and also affidavits, and it was clear in Siderman that there was ownership or operation of the hotel. What we're talking about here is a situation in which property has been destroyed and allegedly the remnants of the property have been dispersed during war and some portion of that, which has been denominated, the Ustasha treasury supposedly came down the Italian peninsula. Whether any portion, whether any particular plaintiff's property was even in the Ustasha treasury is a conclusion here that's not supportable. If we get beyond that, what activity in the United States would tie it to or give it nexus? Well, there are other cases that address this, the Garb case, the Agudas case, which plaintiffs cite, where there are concrete commercial connections with the United States. In those cases, there are clear contacts. There is activity, for example, in the Agudas case, of a commercial nature between the United States and the Russian Federation regarding the property. That was a case that involved contesting the ownership of some books and whether the Russian foreign sovereign was required to turn over those books. In that case, the instrumentality in question had extensive commercial contacts with the United States. These plaintiffs do not plead any contacts of that nature. They plead activity by groups in Chicago that have nothing to do with the IOR. They made a passing allegation to correspondent bank accounts. Under the second section, under the second prong, the second nexus prong, there's a requirement that the foreign state or the agency or instrumentality of the foreign state be engaged in commercial activity. Well, isn't the Vatican Bank engaged in commercial activity in the United States to some extent? There's no, absolutely no allegation to that extent, no. There's no allegation that supports that in 1999, when this lawsuit was filed, the IOR was engaged in commercial activity in the United States. Where is the money laundering supposed to have taken place? Well, according to plaintiffs' complaints somewhere outside the United States, the money laundering appears, this is another problem, I think, with plaintiffs' theory. Some of their money, some of the Ustasha Treasury, if we're to credit the allegations, some of the Ustasha Treasury ends up in Swiss banks. Some of it comes down the peninsula and is laundered by the OFM. Some of it goes into, according to them, the IOR. And I don't really understand their laundering theory, but apparently it mysteriously goes into the IOR and it's distributed to terrorists and Ustasha throughout the world. That's their theory. Other questions? Any further questions? I have no other questions. I think we have your argument. Thank you very much. Thank you. Rebuttal? Just two quick points on rebuttal. First of all, on the facial challenge issue, plaintiffs, defendants, and the district court all took it as a facial challenge. And, in fact, the district court sua sponte canceled oral argument on this case. So there was no opportunity to have oral argument as you would in a normal factual challenge. And I agree the Vatican Bank probably could have submitted simply a note from the Vatican saying it's part of the Vatican. And that would have been sufficient on a factual challenge. But it is the normal procedure in these kind of cases where Vatican or alleged Vatican entities are involved to make a facial challenge. And that's what occurred in Doe v. Holy See. That's what occurred in O'Brien v. Holy See in the Sixth Circuit. It occurred in Dale v. Colagiovanni in Holy See, I believe in the Fifth Circuit. And because they choose to make facial challenges, knowing the problems with facial challenges, then problems exist that have to be sorted out by the appellate court because it's very difficult to prove a fact when you're making a facial challenge. Secondly, on the Foreign Sovereign Immunity Act exceptions, we would point to the Agudas case. We don't believe, and I know it's a very complex and convoluted case, something like this one. And it goes back even further to 1917. But we don't believe that the commercial contact between Russia or the Russian Library and the United States had anything to do with the property in that case. It had to do with publication of other books. And we think we're probably a little clearer than that because we're talking about fungible transactions in gold. Gold is a fungible commodity. It's documented in other court cases what the Nazis and people allied with them did. I mean, you don't carry around sacks of gold teeth. You re-smelt it into something that you can trade or use. And therefore, if you're doing gold transactions worldwide, it's quite possible and plausible that that contains commingled stolen assets. Okay. Thank you for your arguments. The case will be submitted for decision.
judges: Fletcher B. , Thomas, Smith N. R.